# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

SHAWNA CHRISTINE GLYNN,          )
                                 )
            Plaintiff,           )
                                 )
      v.                         )          No. 4:24-cv-01202-RHH
                                 )
AUTOMOBILE CLUB OF MISSOURI,     )
                                 )
            Defendant.           )

## MEMORANDUM AND ORDER

Self-represented Plaintiff Shawna Christine Glynn brings this employment discrimination action under the Americans with Disabilities Act of 1990 (ADA), seeking relief against her prior employer, Automobile Club of Missouri.  Now before the Court is Plaintiff's Amended Complaint and supplemental filings for review under 28 U.S.C. § 1915(e).  As discussed in detail below, the Court finds that Plaintiff's pleadings fail to state a claim upon which relief may be granted and therefore, this case will be dismissed without prejudice.  *See* 28 U.S.C. § 1915(e)(2)(B).

## Case Background

On January 10, 2025, the Court granted Plaintiff's motion to proceed *in forma pauperis* and reviewed Plaintiff's original employment discrimination complaint under 28 U.S.C. § 1915(e)(2).  ECF No. 7.  In that Order, the Court found that Plaintiff had not adequately alleged claims to survive initial review.  *Id.* at 3.  However, the Court allowed Plaintiff to attempt to cure her pleadings deficiencies by filing an amended complaint.  The Court explained that Plaintiff should only bring claims in her amended complaint that had been exhausted with the Equal Employment Opportunity Commission (EEOC), and that she could only name her prior employer as a defendant.  *Id.* at 4-6.  The Court warned Plaintiff that her amended complaint would also be

reviewed under 28 U.S.C. § 1915.  *Id.* at 7.

### The Amended Complaint

On February 20, 2025, Plaintiff filed an Amended Complaint against her prior employer, Defendant Automobile Club of Missouri,[1] seeking relief under the ADA, 42 U.S.C. §§ 12101, *et seq*.  ECF No. 8.  The Amended Complaint is difficult to decipher based on poor copy quality, blurred writing, and duplicate pages.  *Id.*  However, it is clear from the filing that Plaintiff alleges discrimination on the basis of disability and "other."  *Id.* at 8.  She states that the discriminatory conduct at issue includes termination of her employment, failure to accommodate her disability, unequal terms and conditions of her employment, retaliation, harassment, and "other."  *Id.* at 7. Next to both of the "other" responses, and in response to many other questions on the form complaint, Plaintiff wrote: "SEE ATTACHED."  *Id.* at 5-8.  Plaintiff's Amended Complaint never names her alleged disabilities.[2]

Plaintiff attached to the Amended Complaint a 19-page document that is long, rambling, and difficult to understand.[3]  ECF No. 8-2.  First, Plaintiff alleges Defendant discriminated against her because she sought accommodations for her disabilities.  *Id.* at 16.  According to Plaintiff,

---

[1] One of the instructions to Plaintiff in the Court's January 10, 2025 Order was that she should only name her prior employer as the defendant in this action, and not any coworkers or supervisors.  ECF No. 7 at 5-6.  As a result, Plaintiff named only Defendant "Automobile Club of Missouri" on her Amended Complaint.  ECF No. 8 at 1-2.  Despite this, Plaintiff repeatedly refers to the Defendant as "AAA" in the allegations of her Amended Complaint and supplements. *See* ECF Nos. 8-2 & 10 to 10-2.  However, the Court will liberally construe all allegations as being against Plaintiff's prior employer, Defendant Automobile Club of Missouri.

[2] Although Plaintiff's Amended Complaint completely replaces her prior pleadings, the Court acknowledges that Plaintiff's original Complaint listed her disability, perceived disability, and/or "life threatening conditions" as: Epilepsy, Ehlers Danlos, PTSD, Diabetes, swollen pancreas, "EDS," pituitary microadenoma, post laminectomy syndrome, "active need for a 2 level spinal fusion," and "2 very large cysts on [] left ovary."  ECF Nos. 1 at 5; 1-2 at 2.  However, only the medical conditions discussed in the Amended Complaint and supplemental filings will be discussed by the Court.

[3] In assessing whether a complaint sufficiently states a valid claim for relief, courts may consider materials that are attached to the complaint as exhibits.  *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011) (citations omitted); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Defendant failed to accommodate her on "NUMEROUS" occasions while "actively provid[ing] such accommodations to most of their other employees willingly, without rebuke, and WITHOUT medical necessity." *Id.* at 1 (capitalization in original). Plaintiff states that "as far back as June 2022," she "was in need of remote access for medical accommodations." According to Plaintiff, she supported this request with a statement of her "conditions" on her "previous neurologist's letterhead;" with her medical claims generally; and with the fact that she had "auras at work." *Id.*

Plaintiff states that she was given a "PARTIAL" accommodation for 4 months, but she argues that "the most serious" of her doctors' accommodation requests were ignored. *Id.* at 3. She asserts that the partial accommodation "only led to further discrimination" because Plaintiff was "removed from [her] peer group" and forced "to sit amongst management only." *Id.* at 16. At one point, Plaintiff describes her accommodation request as "a simple temporary accommodation" and at another point, she states that her supervisor "accommodated [her] with ONLY a desk, bypassing the requests of remote accommodations, and freedom to move around as per needed." *Id.* at 9, 17.

Plaintiff further discusses how her supervisor "forced" her "out of work" for ten days while her "antibiotics and anti virals [ran] their course," "rather than allowing [her] remote access to work, or a simple hat accommodation," even though Plaintiff's doctor had cleared her to work. *Id.* at 18-19. Plaintiff argues that she should have been allowed to work remotely for those ten days, as she was already set up for remote work because she "had been pursuing this for over a year for different medical issues." *Id.* at 19.

Plaintiff makes many additional claims in the Amended Complaint, but she does not provide enough facts for the Court to determine if they are related to her discrimination claim. For example, Plaintiff claims a supervisor gave her a "final warning" in an act of retaliation—she calls it a "retaliatory final"—but it is not clear what the warning was for and what the supervisor was

3

retaliating against Plaintiff for doing.  *Id.* at 4-5.  After receiving the warning—which was "approved by HR"—Plaintiff was "wrongfully" required to complete discrimination training modules.  *Id.* at 5, 17.  Plaintiff also makes many assertions about a "STD claim" – a claim for short term disability.  *Id.* at 6.  She asserts that her claim took 2 months to be approved but then Defendant refused to pay her the money, insurance, and benefits that she was entitled to "after only 1.5 pay cycles."  *Id.*  Plaintiff also claims that Defendant failed to pay her, and many other employees, money that they were "owed," and that Defendant incorrectly deducted taxes from her paycheck and overinflated her earnings.  *Id.* at 2, 6, 9-10, 18.  She asserts that Defendant denied her use of "PTO to check on [her] ESA [emotional support animal]" during severe weather conditions and that she was "threatened [] with attendance points … if [she] failed to return from checking on [her] ESA."  *Id.* at 2-3.  In addition, Plaintiff alleges Defendant committed "FMLA" and "FCRA" violations against her.  *Id.* at 8, 13, 15-17.  Finally, Plaintiff also makes vague allegations regarding racial discrimination by Defendant.  *Id.* at 5.

In terms of relief, Plaintiff seeks 10 million dollars.  *Id.* at 1-9, 19.  She supports this request with a list of damages that she alleges she suffered as a result of Defendant's actions, including: loss of her car, credit cards, and lines of credit; loss of her ability to care for herself, her ESA, and "a grievously ill parent;" causing her to go into debt to her neighbors; destroying her reputation; "land[ing] [her] on Medicaid;" getting her "forcibly committed to [a] mental ward when a friend feared [she] would commit suicide;" loss of wages from a career position until retirement age; loss of future benefits; suffering "psychological, emotional, financial, and physical damages;" possible future losses; sleepless nights; loss of time spent on her legal filings and money spent on transportation since she lost her car; "loss of freedom;" loss of her ability to "trust" employers; and suffering public humiliation.  *Id.* at 2, 4, 7-8, 10-16 19.

4

Plaintiff's Amended Complaint indicates that she exhausted federal administrative remedies by filing a Charge of Discrimination with the EEOC and receiving a Right-to-Sue letter. ECF No. 8 at 5.  As for the dates of these filings, Plaintiff states: "See Attached."  Despite Plaintiff's notation and the Court's directive to attach both these documents to her Amended Complaint, *see* ECF No. 7 at 8, Plaintiff only attached her Right-to-Sue letter, dated July 29, 2024. ECF No. 8-1.  Given Plaintiff's self-represented status, the Court will look to the Charge of Discrimination filed with Plaintiff's original Complaint.  *See* ECF No. 1-4.  Plaintiff's Charge of Discrimination, filed July 26, 2024, states as follows:

1. I was hired by the above-named employer on or about February 7, 2022, as an Emergency Dispatcher.  My payrate is approximately $44,800 annually.  I am still employed by the Respondent.

2. I am an individual with disabilities and the employer was made aware of my disabilities. I requested a reasonable accommodation to help me perform the essential functions of my job on or about September 1, 2023.  The employer denied the reasonable accommodation.

3. I believe I was denied a reasonable accommodation for my disabilities, in violation of Title I of the Americans with Disabilities Act of 1990, as amended.

*Id.* at 1.

### Additional Filings from Plaintiff

On March 6, 2025, the Court received a 307-paged supplemental filing from Plaintiff via email.  ECF No. 10.  This filing had to be filed under seal because it does not comply with Local Rule 2.17, which requires the party filing an exhibit with personal data identifiers in it to exclude or partially redact such information.  E.D. Mo. L.R. 2.17(B).  In addition, this filing appears to contain discovery and disclosure materials that are not be supposed to be filed with the Court.  *See* E.D. Mo. L.R. 3.02(A).  Furthermore, to the extent Plaintiff is attempting to amend her pleadings with this information, amendment by interlineation (i.e., by adding language to the pending Amended Complaint) is not allowed because it creates confusion in the record, especially for the

responding party.  *See* ECF No. 10 at 2, 6, 11, 12, & 17 (where Plaintiff provides "Amended" information with corresponding page and question numbers).  *See also Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008) (finding that it is appropriate to deny leave to amend a complaint when a proposed amendment was not submitted with the motion); *Clayton v. White Hall Sch. Dist.*, 778 F.2d 457, 460 (8th Cir. 1985) ("[I]n order to preserve the right to amend the complaint, a party must submit the proposed amendment along with its motion.").

However, after review of the Amended Complaint and Plaintiff's prior pleadings in this matter, it is still not clear to the Court exactly what disability Plaintiff is alleging and what medical accommodation she sought from Defendant, as her Amended Complaint mentions various accommodations related to remote work, a desk, a hat, and her emotional support animal (ESA). As such, in order to liberally construe and carefully consider self-represented Plaintiff's allegations, the Court will review these voluminous supplemental filings.  However, the Court will only consider the information in the supplemental filing that the Court can decipher[4] and which appears relevant to Plaintiff's disability discrimination claim at issue here.[5]

These repetitive[6] supplemental filings provide excessive and often contradictory

---

[4] The pages of these supplemental filings appear to have been filed out of order (ECF No. 10 at 1, 27, 53, 81, 107; ECF No. 10-1 at 1, 34, 61, 80; ECF No. 10-2 at 1, 10, 39) and many of the screenshot images are unreadable (ECF No. 10 at 31, 35, 37, 42, 45, 47, 50, 57, 71, 87, 93, 97, 100, 103; ECF No. 10-1 at 78, 87-89; ECF No. 10-2 at 1, 10, 39, 62).

[5] Most of the information in these supplemental filings appears to be irrelevant to Plaintiff's disability claim.  For example, Plaintiff includes a list of "Other" legal claims that are not related to employment discrimination, including complaints about violations of "FMLA laws," taxation practices, wage and labor standards, illegal business practices, and FCRA violations. ECF No. 10 at 18.  Plaintiff also complains about "poor" scheduling (*id.* at 23-25); treatment and termination of other employees (*id.* at 30, 76, 82, 92, 94-95, 111-14); an unfair attendance policy and "points" system (*id.* at 37, 41, 48, 72-76, 89, 92, 102); inadequacies and nonenforcement of Defendant's employee handbook policies (*id.* at 76-79); incorrect holiday pay (*id.* at 125-30); understaffing issues (ECF No. 10-1 at 96); coworkers being mean to her (*id.* at 27-30,69, 84); a change in workload and assignments (*id.* at 41-43); incorrect deduction of taxes from her paycheck (ECF No. 10-2 at 64); and short-term disability leave requests, paperwork, and pay (ECF No. 10 at 28-29; ECF No. 10-2 at 39-40, 60).

[6] Plaintiff repeats hundreds of times, after almost every accusation of wrongdoing against any person, the following statement: "For this, I seek relief in the form of 10,000,000 for actual, financial, FCRA, real, emotional, and punitive

information on essentially every complaint and issue that Plaintiff had with Defendant and her coworkers while employed by Defendant, from when she started in February 2022 until her termination in December 2024.  Plaintiff worked as a dispatch operator for Defendant on the "swing shift."  Based on the information provided, her job was mostly done while seated at a desk, answering phone calls that came in.  She discusses in detail—sometimes with an almost day-to-day recounting—how she feels she was treated unfairly by her coworkers, supervisors, and the human resources department while employed by Defendant.  She also admits that she often got into arguments with her coworkers and supervisors, and that she often threatened them with a lawsuit.  The Court has done its best to pull out and summarize the information relevant to her disability discrimination claim as follows.

## I.    Plaintiff's Medical Conditions and Diagnoses

Plaintiff provides a lot of documentation and annotation on various medical conditions and diagnoses.  Included documents appear to indicate that Plaintiff has received medical care and/or been diagnosed with the following: a cystic lesion in her pituitary gland and/or "pituitary microadenoma," related to high prolactin levels (ECF No. 10 at 43, 67, 96, 98, 102; ECF No. 10-1 at 81); unspecified "psychiatric disability" (ECF No. 10 at 52); "auras" (*id.* at 54, 115); a staph infection and shingles (*id.* at 60); an ongoing "back condition" and March 2024 back injury, resulting in a doctor recommending a "minimally invasive [spinal] fusion" surgery that Plaintiff never had (ECF No. 10 at 116; ECF No. 10-2 at 2, 12, 36, 51, 69-71); being "prone to seizures" and having a seizure disorder (ECF No. 10 at 102, 115); diabetes (*id.* at 102); a benign lump in her breast (ECF No. 10-1 at 7, 13-16); and abdominal pain due to a swollen pancreas (ECF No. 10-2 at 58-59.  Plaintiff also provided many screenshots of unexplained medical tests with unknown

damages."  ECF Nos. 10 to 10-2.

results.  ECF No. 10 at 58, 61, 69, 83-84, 91; ECF No. 10-1 at 6, 32, 82.

## II.    Request to Work from Home

Plaintiff was hired by Defendant on February 7, 2022.  ECF No. 10 at 108.  Her employment with Defendant was "obtained remotely via an interview" while Plaintiff was in Kansas City, but once employed, she worked at Defendant's headquarters in St. Louis County "both ONSITE[] and eventually REMOTELY."  *Id.* at 6.  Plaintiff provides conflicting information on remote work for all Defendant's employees, stating both that most Defendant's employees worked remotely (*id.* at 6) and that "ALL" employees worked on site (*id.* at 87).  *See also id.* at 111 (listing employees who had to report to headquarters); ECF No. 10-2 (listing employees, her perception of their disability status, and whether they worked remotely).  However, Plaintiff admits that when she was hired, she was told that she had to work "onsite" and that this was acceptable to her.  ECF No. 10 at 6.  On the other hand, Plaintiff also discusses how she realized in 2021 (the year prior to employment with Defendant), that she needed to find a job that would allow her to work from home, given her recent seizure activity and the danger from driving.  *Id.* at 115.

In July 2022, Plaintiff "talked to management about [her] needs for accommodation," supported by a letter from her "previous Neurologist."  *Id.* at 114-16, 118-19.  The neurologist's letter was dated April 2020—making it over two years old—and stated that Plaintiff had "concerns [about] contracting an acute illness during the pandemic" and asked that she be granted "accommodations that would limit interpersonal exposure" including possibly "working from home."  *Id.* at 119.  At the time of her request, Plaintiff pointed out to management that they were allowing a different employee, who had been in a car accident, to work remotely.  *Id.* at 116.  Subsequently, that employee was told that she had to provide a "doctor's accommodation" to continue working remotely.  *Id.*  Plaintiff does not state how Defendant responded to her initial

8

request to work remotely, but she states that employees, like herself, were told that they were not "eligible" to work from home because of their "stats" and "attendance." *Id.* at 117. Plaintiff alleges that these measurements were "factually" incorrect. She states that she continued to seek remote work and was told to check with the Defendant's national human resources department. *Id.* at 117-18.

Around October or November 2022, a remote work position "opened up." *Id.* at 120. Plaintiff asked for a schedule change to fill the remote position. Plaintiff states that she was denied the position and that it was "given to a younger, presumably more able-bodied coworker [] of another race." When asked why she did not get the position, she was told "inadequate stats." Plaintiff had only "briefly interacted … a few times" with the person who got the position, but Plaintiff "believe[s]" that the person "ROUTINELY underperformed." Plaintiff admits that another coworker of hers, who she describes as "visibly disabled," was also unable to get a remote position. *Id.* Plaintiff also admits that on numerous occasions when she asked for a new shift, she attempted to justify the change by explaining that she needed to get her emotional support dog into training, instead of providing a medical reason for the needed change. *Id.* at 122.

It appears that, at some point, Defendant responded to Plaintiff's 2-year-old, previous neurologist's letter by asking for a more recent doctor's note. Plaintiff asserts that she could not submit her medical accommodation request to Defendant's human resource department because she "was ACTIVELY in between neurologists at the moment" and her primary doctor "refused to talk to [her] about ANYTHING seizure related." *Id.* at 124. However, eventually, Plaintiff did submit paperwork about "FMLA" and "WFH" (work from home) in September 2023 and her new neurologist submitted paperwork around October 24 or 25 of 2023. ECF No. 10-1 at 8-11, 35. Plaintiff does not provide copies of that paperwork or explain exactly what her new neurologist

9

recommended in terms of accommodations.

In December 2023, Plaintiff had to leave work early one day and take time off due to back pain. ECF No. 10-2 at 2-3. Before her return to work, she called the office with concerns about a forecasted ice storm, "angry at the prospect of having to drive" to work in it. *Id.* at 3. She spoke with a supervisor, complaining about how she "STILL hadn't been accommodated for something that [she'd] requested for WELL OVER A YEAR now;" how she shouldn't even be driving given her medical issues; and she threatened a "huge lawsuit." *Id.* The supervisor informed Plaintiff that he had not seen her doctor's accommodation request to work from home. Two days later, on December 30, 2023, Plaintiff was allowed to work from home due to "inclement weather" and she got to "REMAIN working from home from that point on." *Id.* at 7.

## III.    Request for Specific Office Equipment

In September 2023, Plaintiff requested an ergonomic chair for use at work, supporting the request with a doctor's prescription written in September of 2016. ECF No. 10-1 at 18-26. Despite Plaintiff failing to provide more recent medical documentation after being asked to, Defendant still tried to get her the chair accommodation that she requested. *Id.* at 23, 25. She admits that she received a "partial" accommodation in September 2023 when she was moved to a new ADA desk that had a "working lift," but that she did not get assigned a comfortable chair. *Id.* at 27-30. She calls this move "retaliatory" because she was moved to a desk "amongst management" instead of near her "peers." *Id.* at 27, 31.

## IV.    Request to Wear a Hat

Plaintiff repeatedly discusses what she calls her "forced pay stoppage for 10 days," describing it as an "unlawful ASSESSMENT OF MY EMPLOYMENT" which occurred when her supervisor "shut down [her] pay for 10 days rather than simply let[ting her] wear a hat." ECF

No. 10-2 at 9, 65.  This incident was mentioned in the Amended Complaint but explained in detail in the supplemental filings.  Plaintiff describes a diagnosis over "the Memorial Day holiday, May 29th-30th, 2023" of staph infection and shingles that required antibiotics and antiviral medications. ECF No, 10 at 60.  Plaintiff provides conflicting information on her return to work, stating both that her physician told her that she could work if she covered her head and leg so she reported to work the next day (*id.* at 60-61), but also that she did not report back to work until June 5th (*id.* at 67).  Regardless, upon returning to work, Plaintiff's supervisor informed her that she could not come back to work until she had completed the 10-day cycle of medication, and the entire rash was gone.  *Id.* at 67.  Plaintiff describes this incident as a denial of her requested accommodation to wear a hat (*id.* at 67 & 71), but she included a document stating that she was actually sent home due to the "highly contagious" nature of her recently diagnosed illness (of shingles).  *Id.* at 68.

## V.        Requests Regarding Emotional Support Animal

Plaintiff also discusses her emotional support dog, Hazel, and how her care of Hazel affected her employment with Defendant.  Plaintiff filed a March 2023 letter signed by a physician, prescribing Plaintiff an "Emotional Support Animal-Dog" to help her cope with her unspecified "psychiatric disability."  *Id.* at 52.  However, it is clear from the documents that Plaintiff owned Hazel for many years prior to receiving this prescription.  *Id.* at 115 (describing her care of Hazel in 2021).  And Plaintiff later admits, around the end of 2022, she was trying to get Hazel "into training classes so that [she] could ultimately make her a service animal."  *Id.* at 122.  As such, it appears that Plaintiff labels her dog Hazel as an "Emotional Support Animal," but Hazel has not actually received the required training for such accreditation.

Regardless, Plaintiff complains that she was denied use of her paid time off (PTO), on three separate occasions, when she wanted to go home and check on Hazel due to severe weather in the

area. *Id.* at 85-86. She states that the first denial was in November or December 2022—a couple of months before her doctor prescribed her an emotional support animal. *Id.* at 85. Plaintiff also states that Defendant denied her request to bring Hazel to work with her daily, but she admits that Defendant did not know that Hazel was an emotional support animal at the time of the request. *Id.* at 49.

## VI.     Plaintiff's Medical Leave and Termination

Plaintiff took leave from employment with Defendant from approximately April to September 2024. ECF No. 10-2 at 32, 69. As such, she was on leave when she filed her Charge of Discrimination with the EEOC on July 26, 2024. ECF Nos. 1 at 7. Plaintiff initially went on medical leave due to a back injury that she suffered while doing yard work, but she later requested multiple extensions of the leave due to a swollen pancreas and a "gastric surgical procedure." ECF No. 10-2 at 15-16, 18, 44-46, 51, 59, 69-72. Plaintiff had multiple disputes with Defendant about her leave time, paperwork, and pay. *Id.* at 12-17, 50-51, 54-55, 59 (discussing delays in approving leave and delays in leave pay; disagreements about length of leave; and whether leave was "FMLA" or "STD" leave). Plaintiff alleges that on July 8, 2024, her paid medical leave became unpaid administrative leave, thereby discontinuing her STD disability pay and medical benefits. *Id.* at 19-21, 27-28. At some point, Plaintiff was apparently healthy enough to return to work (because she got a job at Walmart), but she refused to return to Defendant's employ because she claimed that Defendant still owed her money. *See id.* at 25, 28, 30-31 (when she informed Defendant that she was employed elsewhere and her supervisor asked if she was resigning from Defendant's employ, she stated that she had no intention of resigning and that she "was more than willing to come back" but that she "will not come back to [Defendant] until [she is] paid" what she believed that she was owed.)

Plaintiff filed this suit on September 2, 2024.  ECF No. 1 at 7.  It appears that after initiating this case, Plaintiff went back to work for Defendant on September 10, 2024, but she states that if she "still had [her] car, [she] would've remained working for Walmart."  ECF No. 10-2 at 32.

### Legal Standard on Initial Review

Under 28 U.S.C. § 1915(e)(2), the Court may dismiss a complaint filed *in forma pauperis* if the action is frivolous or malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief.  When reviewing a complaint filed by a self-represented person under 28 U.S.C. § 1915, the Court accepts the well-pleaded facts as true, *White v. Clark*, 750 F.2d 721, 722 (8th Cir. 1984), and it liberally construes the complaint.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  A "liberal construction" means that if the essence of an allegation is discernible, the district court should construe the plaintiff's complaint in a way that permits the claim to be considered within the proper legal framework.  *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015).  However, even self-represented plaintiffs are required to allege facts which, if true, state a claim for relief as a matter of law.  *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980); *see also Stone v. Harry*, 364 F.3d 912, 914-15 (8th Cir. 2004) (refusing to supply additional facts or to construct a legal theory for the self-represented plaintiff).

To state a claim for relief, a complaint must plead more than "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff must demonstrate a plausible claim for relief, which is more than a "mere possibility of misconduct."  *Id.* at 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678.

13

Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Id.* at 679.

### Discussion

Based on a careful review and liberal construction of Plaintiff's filings, the Court finds that Plaintiff has not adequately alleged facts to support a disability discrimination claim under the ADA. Plaintiff complains profusely about allegedly unfair employment practices by Defendant, but such unfair employment actions do not necessarily constitute discrimination. Plaintiff's pleadings fail to establish the required elements of a claim of discrimination under the ADA. In addition, many of Plaintiff's claims were not administratively exhausted with the EEOC, as she initiated this lawsuit before her termination from employment with Defendant. As such, this case will be dismissed under 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim upon which relief may be granted.

### I.    Only claims exhausted with the EEOC will be considered by the Court.

As Plaintiff was warned by the Court in its January 10, 2025 Order, allegations that were not exhausted with the EEOC are subject to dismissal. ECF No. 7 at 4-5. Before bringing a suit under Title I of the ADA, a plaintiff must first file a charge of discrimination with the EEOC and receive a right-to-sue letter. 42 U.S.C. § 12117(a) (the remedies and procedures set forth in Title VII, including those pertaining to exhaustion, apply to persons alleging employment discrimination based on disability under the ADA); *Kent v. Dir., Mo. Dep't of Elementary and Secondary Educ. & Div. of Vocational Rehab.*, 792 F. Supp. 59, 61-62 (E.D. Mo. 1992) (receipt of a right-to-sue letter is a prerequisite to bringing suit under Title I of the ADA). "A plaintiff may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Dorsey v. Pinnacle Automation Co.*, 278 F.3d

830, 838 (8th Cir. 2002) (internal quotation and citation omitted).  Since a person filing EEOC charges typically lacks legal training, the charges are interpreted liberally.  *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988) (citation omitted).  Nevertheless, to allow "a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 223 (8th Cir. 1994) (internal quotation and citation omitted).

In this case, when Plaintiff filed her Charge of Discrimination on July 26, 2024, she was still employed by Defendant.  ECF Nos. 1-4 at 1 (stating that Plaintiff was "still employed" by Defendant at the time of filing the Charge), 8-2 at 11 (stating she "lost" her job on "December 19 2024").[7]  As such, the Charge did not allege any discrimination in relation to Plaintiff's employment termination (like the Amended Complaint does), because Plaintiff had not yet been terminated.  Plaintiff was not terminated until three months after this case was initiated.  *See* ECF No. 1 at 7 (original Complaint signed by Plaintiff on September 2, 2024).  As such, the Court will not consider any argument or allegation of discrimination associated with Plaintiff's termination. To the extent Plaintiff is alleging any discrimination related to her termination, such claim is dismissed.

Furthermore, Plaintiff also alleges in her Amended Complaint that she suffered discrimination based on retaliation, harassment, and disparate terms and conditions of employment.  ECF No. 8 at 7.  However, no similar allegations were made in Plaintiff's Charge

---

[7] Despite providing a specific date that she was terminated from employment with Defendant, Plaintiff still "perceive[s]" that Defendant wrongfully terminated her twice: "Once while [she] was out on leave and they no longer wished to pay [her], and once 24 hours after an email request[]."  ECF No. 8-2 at 13, 17.  This first "perceive[d]" termination—which occurred before Plaintiff initiated this action—will be discussed below as a possible adverse employment action.

of Discrimination.  ECF No. 1-4 at 1.  The Court can only consider exhausted claims that are "reasonably related to the substance of the allegations in the administrative charge." *Dorsey*, 278 F.3d at 838.  Any unexhausted claims are subject to dismissal.  *See Williams*, 21 F.3d at 223 (affirming dismissal of race discrimination claim where charge of discrimination only mentioned retaliation).  To the extent that a retaliation claim under the ADA could possibly be considered related to Plaintiff's other allegations, it is discussed below.  However, the Court cannot find any factual support for a harassment or disparate terms or conditions of employment claim that is reasonably related here.  In fact, Plaintiff admits that many, if not most, of Defendant's employees are disabled individuals like herself.  She alleges no facts indicating that she was harassed or treated differently due to her disability status.

For these reasons, the Court will only consider the allegations raised and exhausted in Plaintiff's Charge of Discrimination, filed with the EEOC.  These include ADA claims based on disability discrimination, failure to accommodate, and retaliation.  All other alleged claims are dismissed for failure to exhaust.

## II.    Plaintiff's pleadings fail to allege an ADA claim.

### a.   General Disability Discrimination Claim

To establish discrimination under the ADA, a plaintiff must allege she (1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of her disability.  *See Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013).  Under the ADA, "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).

In this case, the Court cannot find facts in the record that support any of these required

elements of a disability discrimination claim. Plaintiff's initial request to work from home was supported by an April 2020 doctor's note discussing Plaintiff's desire to avoid exposure to germs. On or around October 24 or 25, 2023, Plaintiff's new neurologist provided updated medical paperwork to Defendant, regarding her need to work from home. ECF No. 10-1 at 35. But Plaintiff does not provide that paperwork or explain its contents. Based on Plaintiff's general argument that she needed to work from home because of the dangers of driving to and from work with a seizure disorder, most likely the paperwork pertained to that medical condition. However, when Plaintiff filed her Charge of Discrimination with the EEOC against the Defendant, she was on medical leave due to a back injury. ECF No. 10-2 at 13-23. She alleges she needed a spinal fusion surgery, but it does not appear that she ever had that surgery. Plaintiff later sought an extension of her medical leave due to a swollen pancreas, but it is not clear what further treatment, if any, was required. *Id.* at 58-59.

Based on all this medical information, the Court cannot decipher what disability Plaintiff is claiming to have within the meaning of the ADA, and on what disability she claims she was discriminated. Despite the hundreds of pages of filings on Plaintiff's health, there is no clear record of a physical or mental impairment that substantially limits one or more life activities for Plaintiff. Even if the Court assumed Plaintiff had every medical condition discussed in the extensive pleadings, there is no evidence that Defendant discriminated against Plaintiff based on her having any disability associated with those conditions.

Furthermore, Plaintiff cannot establish the third required element for an ADA disability discrimination claim—that she suffered an adverse employment action **because of** her disability. "An adverse employment action is one that causes a material change in the terms or conditions of employment." *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 716 (8th Cir. 2003). As

17

discussed above, Plaintiff had not been terminated from Defendant's employment when she initiated this case, therefore, her termination would not qualify as an adverse employment action in support of her ADA claim.  Liberally construing the allegations of Plaintiff's pleadings, she is claiming that Defendant's conversion of her paid medical leave to unpaid administrative leave around July 8, 2024, constituted an adverse employment action.  Undoubtedly, this event changed a material term of her employment because she was no longer receiving STD pay.  However, there are no facts alleged that support the assertion that this change had anything to do with Plaintiff's alleged disability.

Based on the supplemental filings, while Plaintiff was on medical leave, there was a lot of confusion between Plaintiff and Defendant as to whether Plaintiff had submitted all the required paperwork for leave and when she would return to work.  *See* ECF No. 10-2 at 43 (May 2, 2024 email asking Plaintiff when she intends to return to work); 45 (May 3, 2024 email stating that required leave paperwork had not been received); 48 (May 10, 2024 email stating that Plaintiff did not provide all the needed information for determination of her leave request).  Plaintiff was expected back at work on June 28, 2024 by Defendant, but she did not come in and Defendant could not get in touch with her by phone.  *Id.* at 57 (June 28, 2024 email stating that Defendant had not heard from Plaintiff and that they had not received a request for a leave extension).  On the following day, June 29, 2024, Plaintiff emailed her supervisor stating that, just two days prior, her doctor had extended her medical leave for a month.  *Id.* at 58-59.  It is unclear whether Plaintiff and her doctors had submitted all the necessary paperwork for this leave extension.  Plaintiff alleges on July 8, 2024—a little over a week later—the STD pay that she was receiving during her medical leave ended, and Defendant placed her on unpaid administrative leave.  *Id.* at 19.

None of the evidence presented supports a finding that Defendant discriminated against

Plaintiff based on a disability. Although self-represented complaints must be liberally construed, *Erickson*, 551 U.S. at 94, nevertheless, such pleadings cannot be conclusory, and must set forth facts that, taken as true, state a claim as a matter of law. *Johnson v. Stark*, 717 F.2d 1550, 1552 (8th Cir. 1983). A court will not supply additional facts or create a legal theory assuming facts that have not been pleaded. *Stone*, 364 F.3d at 914.

In this case, there is no evidence that supports the conclusion that Defendant was switched from STD medical leave to unpaid administrative leave based on an alleged disability. Plaintiff fails to plead the required elements of an ADA disability discrimination claim and therefore, this claim must be dismissed.

### b. Failure to Accommodate Claim

The ADA prohibits covered employers from discriminating against a "qualified individual" on the basis of disability. 42 U.S.C. § 12112(a). Under the ADA, employers must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless doing so "would impose an undue hardship on the operation of the" employer's business. 42 U.S.C. § 12112(b)(5). When an employer fails to make such reasonable accommodation, it discriminates against the employee. *See Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1059 (8th Cir. 2016).

To succeed on a claim for failure to accommodate a disability, a plaintiff must establish that: (1) she was disabled under the ADA; (2) the defendant knew that she was disabled; (3) she requested an accommodation; (4) the defendant failed to engage in a "flexible" and "informal[ ] interactive process" with her about possible accommodations; and (5) her disability could have been reasonably accommodated had the interactive process taken place. *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 941 (8th Cir. 2019). "An individual requesting an accommodation must 'make

a facial showing that reasonable accommodation is possible, and that the accommodation will allow her to perform the essential functions of the job.'" *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 546 (8th Cir. 2018) (quoting *Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003)).

In this case, Plaintiff again fails to plead facts in support of the required elements of a failure-to-accommodate disability discrimination claim. As discussed above, it is unclear what disability Plaintiff is alleging to have under the ADA. Regardless, the Court has done its best to construe Plaintiff's possible disability claims in relation to her requested accommodations.

### i.  Request to Work from Home

Plaintiff's main allegation seems to be that she requested to work from home and that this accommodation was repeatedly denied, before finally being granted. Plaintiff admits that when she started employment with Defendant, she accepted the job knowing that it required her to work onsite in Defendant's headquarters office. Plaintiff alleges that it took over a year for her to get a medical accommodation to work from home after first requesting one, but based on the pleadings, Plaintiff was allowed to start working from home approximately two months after she submitted recent medical paperwork from a current doctor. Plaintiff claims that she needed this work-from-home accommodation due to a seizure disorder and the fact that she is not supposed to drive for six months following a seizure. However, it appears that Plaintiff's last seizure occurred in 2021— more than six months before she took the onsite job with Defendant. Furthermore, Plaintiff's initial request to work remotely was accompanied by a doctor's note regarding her desire to avoid exposure to germs and had no mention of a seizure disorder. Plaintiff even admits to having taken a job at Walmart, which she drove to, after she was placed on unpaid administrative leave by Defendant in July 2024.

Based on all these facts, there is no indication that Defendant failed to provide Plaintiff with the medical accommodation of working from home within a reasonable time frame.  Plaintiff cannot establish that Defendant failed to engage in an "interactive process" about possible accommodations with Plaintiff.  *See Garrison*, 939 F.3d at 941.  It appears that Defendant did consider and grant Plaintiff's accommodation request.  As such, Plaintiff's claim of failure to accommodate, based on a medical need for remote work, fails to state a claim.

### ii.   Other Possible Accommodation Requests

To the extent that Plaintiff is also seeking to assert a failure-to-accommodate claim based on Defendant's failure to provide her with specific ADA office furniture, a 10-day hat accommodation, or permission to bring her dog to work with her, these claims also fail.

Plaintiff requested an ergonomic chair in September 2023 with a doctor's prescription regarding back problems that was written 7 years prior.  When Defendant requested more recent medical documentation, Plaintiff did not provide it.  This is not enough to establish that Plaintiff was disabled within the ADA and that Defendant knew about this disability.  Furthermore, Plaintiff admits that Defendant provide her with a sit-to-stand desk after she requested one.

As for Plaintiff's allegation that she was denied pay for 10 days and sent home because Defendant would not accommodate her request to wear a hat, the facts alleged do not support this assertion.  Instead, the supplemental filing indicates that, after Plaintiff was diagnosed with the highly contagious disease, shingles, she was told that she could not report to work until she had finished her course of antibiotics, and her rash was no longer evident.  This was based on Defendant's policy and had nothing to do with any alleged disability on Plaintiff's part.

Finally, to the extent Plaintiff is alleging that Defendant failed to accommodate her medical need to be with her dog Hazel, the facts in the record do not support this assertion.  Although

Plaintiff provides a doctor's letter stating that she had been prescribed an emotional support dog for help with psychiatric problems, Plaintiff admits that she had her dog Hazel long before receiving this prescription and that she never had Hazel trained to be an emotional support animal. As such, all of Plaintiff's possible failure-to-accommodate disability claims fail.

### c. Retaliation Claim

Plaintiff also attempts to bring an ADA retaliation claim in her Amended Complaint. Even assuming this claim is exhausted because it relates back to the allegations of Plaintiff's Charge of Discrimination, it is still subject to dismissal. Title V of the ADA prohibits retaliating "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). To state a claim under this provision, a plaintiff needs to show that (1) she engaged in statutorily protected activity; (2) adverse action was taken against her; and (3) a causal connection exists between the adverse action and protected activity. *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007).

In this case, Plaintiff has alleged no ADA protected activity that she engaged in which resulted in an adverse action against her. Plaintiff does not assert that she made an ADA charge or participated in any ADA investigation or proceeding, that resulted in retaliation. It is not even clear what act of retaliation Plaintiff is alleging that Defendant took against her. As such, Plaintiff's pleadings fail to state the required elements of a retaliation claim and therefore, this claim must also be dismissed.

### Conclusion

Based on a review of the Amended Complaint and supplemental filings under 28 U.S.C. §

1915, the Court finds that Plaintiff fails to allege sufficient facts to support a claim of disability discrimination under the ADA against her former employer, Defendant Automobile Club of Missouri. As such, this case will be dismissed without prejudice under 28 U.S.C. § 1915(e)(2)(B).

Accordingly,

**IT IS HEREBY ORDERED** that the Clerk shall **not** issue process or cause process to issue upon the Amended Complaint as to defendant Automobile Club of Missouri because the Amended Complaint fails to state a claim upon which relief can be granted. Plaintiff's claims against defendant Automobile Club of Missouri are **DISMISSED without prejudice**. *See* 28 U.S.C. § 1915(e)(2)(B).

**IT IS HEREBY CERTIFIED** that an appeal from this dismissal would not be taken in good faith.

An Order of Dismissal will accompany this Memorandum and Order.

Dated this 28th day of August, 2025.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE